Dale E. MONSON, Robert Jackman, Patrick M. Garaghty, Harry J. Marsh, Jr., Richard Wilfond, William C. Feigal, Dennis Jensen, Kenneth Fishwick, John Smith and Vern Carpenter, individually and on behalf of all others similarly situated, Appellees,

v.

CENTURY MFG. CO., a Minnesota corporation, and in its capacity as administrator of the Century Mfg. Co. Employees Profit Sharing Plan and Trust, and Leland N. Sundet, Louise C. Sundet, Clemens E. Peterson, and Donald Weber, individually and in their capacities as trustees and/or fiduciaries of the Century Mfg. Co. Employees Profit Sharing Plan and Trust, Appellants.

No. 83–2065.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 15, 1984.

Decided June 27, 1984.

Rehearing and Rehearing En Banc Denied Aug. 1, 1984.

Tischleder, Tatone & Wittenkeller, Edward C. Tischleder, Minneapolis, Minn., for appellees.

Dorsey & Whitney, Roger J. Magnuson, Marianne E. Durkin, Minneapolis, Minn., for appellants.

Before BRIGHT, ARNOLD and FAGG, Circuit Judges.

ARNOLD, Circuit Judge.

The plaintiffs, a class of nearly 600 current and former employees of Century Mfg. Co., recovered a judgment of $9,042,-015 in compensatory damages and $500,000 in punitive damages against Century Mfg. Co., Lelund Sundet, the owner of Century, and various corporate officers and agents. The District Court[1] found that Century and its officers had committed fraud, broken a profit-sharing contract, and violated fiduciary duties under ERISA, 29 U.S.C. § 1001 et seq., by paying only about one-third of profits before tax into profit sharing when the company had said that it was paying nearly half of pretax profits into profit sharing. The defendants appeal from this judgment, attacking the finding of liability as well as the amount of damages and the grant of attorneys' fees under ERISA. We affirm the District Court's finding of liability but remand for the court to make findings on two factors bearing on the damage award that have not been directly addressed.

---

1. The Hon. Earl R. Larson, Senior United States District Judge for the District of Minnesota.

## I.

Century Mfg. Co., located in Bloomington, Minnesota, is a privately held company that produces electric welders and battery chargers. It employs about 325 people. The events that gave rise to this litigation began in 1965, when in October the Century Board of Directors adopted a retirement profit-sharing plan.[2] In brief, the plan stated that the employer would contribute 50 per cent. of the "corporate profit" to a retirement fund after $25,000 was subtracted from the net profit. However, the amount of the employer's contribution could not exceed 15 per cent. of the yearly compensation paid to the participants. The plan defined "corporate profit" as:

> the net income of the Employer in any Plan year which is reportable for Federal income tax purposes, after deducting all costs and expenses, including, without limitation, bonuses, commissions, extra or overtime compensation of any kind, or any contributions by the employer to any other employee benefit plans, now or hereafter established, complying with the provisions of section 401 of the Internal Revenue Code of 1954, as amended from time to time, which expense shall not, however, include the Employer's contribution to this Plan nor include state or Federal income or excess profits taxes.

In late 1965 the employees were told about the retirement plan at a plant meeting in which Sundet and Peterson explained how the plan worked.[3] They were told then and on many other occasions between 1965 and 1971 that 50 per cent. of the company's profit before tax would be contributed to the plan, provided that this amount did not exceed 15 per cent. of the

participants' annual compensation. Each year from 1966 to 1971 the Board adopted resolutions calling for the maximum contribution to profit sharing allowed under the plan. In 1966, the Board of Directors passed a resolution that Peterson and Sundet, the only officers, be paid in addition to their salaries "a bonus, equal to one-sixth (1/6) of the corporate net income before profit-sharing and before corporate income taxes and said bonus." This bonus was paid to Peterson and Sundet in 1966 and in each following year through 1971.

In mid-1971, it appeared to the owners that the company's contribution to profit sharing would exceed the 15 per cent. limitation. In view of this, they established a new profit-sharing plan which they called "Cash Profit Sharing." The employees were sent a letter explaining cash profit sharing and a plant meeting was also held to explain the new plan. Under the cash profit-sharing plan, if the 50 per cent. of the profits which were available for profit sharing exceeded 15 per cent. of the participant's annual compensation, this excess would be paid out to participants in cash. In determining a participant's annual compensation the amount received as cash profit sharing would be included. Thus, if in a given year an employee received an annual salary of $10,000 and in addition $5,000 in cash profit sharing, his annual compensation would be $15,000 for purposes of determining the company's 15 per cent. contribution to his retirement account.

From 1971 through 1980, both profit-sharing plans were continued.[4] Up until mid-1980, the employees were continuously told that "nearly"[5] 50 per cent of the cor-

---

**2.** At that time the Board of Directors consisted of Clemens E. Peterson, Leland N. Sundet, and Donald H. Johnson. Peterson and Sundet each owned one-half of the corporate stock. Both men served as trustees under the retirement plan.

**3.** The employees were not given copies of the plan but were told that a copy would be furnished upon request.

**4.** In June 1973 Peterson sold his stock to Sundet, making Sundet the sole shareholder. Peter-

son continued to serve on the Board of Directors until 1978.

**5.** Other words synonymous in meaning to "nearly," such as "approximately" and "about," were also used to describe the portion of the profits that the company contributed to profit sharing. Several of the employees testified that they were told that this qualification referred to the $25,-000 "tax exclusion" deducted from net profits before the amount of profit sharing was deter-

porate profits were allocated to profit sharing and that the cash profit-sharing plan was a way for the employees to make more money for their extra efforts and suggestions. A sampling of the copious representations that the company made during this period serves to demonstrate this point.

In late 1973, the company distributed an employee's handbook entitled *Enjoy the Good Life*. This book was supervised by Sundet and Donald Weber, the controller.[6] It contained an illustration of a dollar bill which Sundet had designed to show that 50 per cent of the profits went into profit sharing. The dollar bill was divided in half, and the left half was designated "for employees." The right half was in turn divided, so as to indicate that approximately one-third of the dollar went to taxes and the remaining one-sixth was left for the company. The handbook also stated: "Nearly 50% of profits before taxes are shared by the employees." In 1975, the company put out a corporate brochure which stated: "Nearly 50% of profits before taxes are shared by our employees." The brochure also contained a dollar-bill diagram similar to the one described above. In 1975 the company issued a press release to all major newspapers, business magazines, and radio and television stations in the Twin Cities area, which stated: "Century employees qualify for one of the most progressive profit sharing plans in manufacturing companies. Approximately 50% of the pre-tax profits are returned to the employees."

From 1971 to late 1980, the company told the employees that "nearly" 50 per cent of the profits went into profit sharing and that profit sharing would reward them for their incentives. Yet during this period the employees were never told that a "bonus" equal to one-third of the profits would be deducted every year prior to splitting the profits with the employees.[7] In fact, every year from 1971 on, a one-third "bonus" was deducted, either pursuant to a resolution of the Board, as a "historical deduction," or pursuant to a new definition of "profits" adopted in 1976. This bonus was paid to Peterson and Sundet in 1971, but in all succeeding years the "bonus" was not paid but left in the company as working capital.

The new definition of profits adopted in 1976 came into being as a result of concern expressed to Sundet by Roger Bunker, a partner in the independent accounting firm that serviced both Century and the plan. In 1975 Bunker had seen the dollar-bill illustration and thought that the illustration and the accompanying explanation might mislead people as to what constitutes profits for profit-sharing purposes. T.XII.136. To remedy this problem Bunker suggested that the company write a new definition of profits into the corporate minutes. He then supplied a proposed definition of profits that explicitly recognized the one-third "bonus," which at one time had actually been paid, but since 1971 had been left in the company.

In 1975, however, the Board did not change the definition of profits but instead passed a resolution stating that the profits

---

mined. In 1976, the amount of the exclusion was increased to $50,000.

**6.** Weber was promoted to general manager in 1978.

**7.** Sundet claims that he told the employees back in 1971 that "we had a bonus" but admits that he did not tell them that this bonus was one-third of the profits. T.VII.42. Rick Carlson, a company employee, did testify that Weber privately told him about the "historical formula," but did not recall being told about a one-third management bonus. Davey Cousins, a Century employee who opted out of the plaintiff class, testified that Weber or Sundet told him about

the one-third bonus before 1980, but he could not remember when.

Even if a few employees knew about the one-third bonus before 1980, there is no question that the rest of the employees did not. Indeed, Weber, the general manager, testified that the employees were not given a definition of profits that explained the one-third bonus. T.II.66. The suggestion that the employees might have known about this bonus prior to 1980 is itself contradicted by Sundet's own admissions at meetings in 1980 that the employees were not told of the bonus, and by the shock that the employees expressed upon finding out about the one-third bonus in late 1980.

should be computed "in accordance with the computations made by the corporation's independent accountant in preceding years." In 1976 the Board adopted a new definition of profits, but it applied only to the cash profit-sharing plan. This definition has been referred to as the "historical formula."[8] It expressly recognizes that "there shall be considered as an expense deduction the historical management percentage bonus whether drawn or not. Historically, this management bonus has been one-third of the normal corporate profit." In 1979 the Board passed a resolution stating in effect that the "historical formula" would now be applied to the retirement plan as well as the cash sharing plan. But, as indicated below, the employees were not informed about this "historical formula" until late 1980.

In 1980 our story comes to its climax with the revelation of the one-third "bonus." The forces that gave rise to the revelation were first set in motion at a meeting in September 1979 among Sundet, Weber, Dennis Prothero, the new director of operations, and Leonard Smith, the director of engineering. Prior to this meeting, Sundet had told Weber and Prothero that profits were down and instructed Prothero to hold plant meetings to improve productivity. After this conversation, Prothero asked Weber if he could obtain the profit figures, because he wanted to communicate the facts, and his information indicated that productivity was significantly up. As a result of this request, the pivotal meeting of September took place. Sundet began the meeting by describing the "historical formula." He drew a diagram that divided the profits into thirds, with one of the thirds going to profit sharing. Prothero indicated that this was not the way the employees understood the

plan. There is evidence that Sundet indicated that he was glad that the truth was getting out.

Later that September or early October, at a regular staff meeting between the same four men, Sundet announced that he had accepted an invitation to speak in San Francisco at the annual conference of the Profit Sharing Council of America. Prothero testified that he, Weber, and Smith asked Sundet to reconsider this decision because of the historical-bonus secret. Over these objections, Sundet went to the west coast and made the speech. In the speech he told the Council that "[a]fter all our expenses are paid out, and we have a profit, the employees received 50% of this profit." He further stated that in order to have an effective plan the employer must "[c]onstantly communicate this plan so that the people understand it and they are able to communicate it with one another." Reprints of this speech were ordered and distributed to Century employees.

In January of 1980 Abdel Abdelwahed became Century's comptroller.[9] At a January meeting he was told about the bonus arrangement. In May Abdelwahed informed two members of Century's accounting department of the "historical formula." The news then spread to various supervisors and department heads. A series of meetings between Sundet and his supervisory staff resulted. At a meeting on October 9, Sundet was asked why the employee handbook said that the employees were getting 50 per cent of the profits when they were really getting only 33 per cent. Sundet reportedly conceded that this was a deliberate misrepresentation. Sundet then appointed a task force to determine what profit sharing would have been had Century contributed 50 per cent of the profits to

8. A word of caution is necessary regarding this formula. In their briefs, the defendants sometimes use the expression "historical formula" as if this were synonymous with the definition of the "profits" in the original 1965 plan. Although the formula may to some extent reflect the way that corporate profits were historically calculated, this formula differs in many important respects from the 1965 definition of profits.

Two major differences are that the formula explicitly recognizes the one-third "bonus" and endorses the deduction of the "bonus" whether or not it is actually paid, whereas the definition of profits does not mention either point.

9. Later in January, Weber resigned, and Abdelwahed assumed many of Weber's duties.

profit sharing. All persons present at this meeting were instructed not to inform any other employees about the profit-sharing discrepancy.

In November the task force presented its report at another management meeting, which again was held under a vow of secrecy. Roger Bunker, representing Century's outside accountants, prepared a worksheet indicating that profit sharing had been shorted by approximately $4.5 million for the years 1971 through 1979, unless Sundet were considered a participant in profit sharing. With Sundet's participation, Bunker estimated that profit sharing had been shorted approximately $2.5 million.

After this meeting a group of management employees sent Sundet a letter stating that if he did not inform the employees about the profit-sharing shortage, the group would do so itself. In response, Sundet sent all employees a letter announcing a plant-wide meeting to discuss among other things "the history and purposes of profit sharing programs at the Company."

On December 11, 1980, the plant meeting took place with about 350 employees in attendance.[10] The meeting was highly emotional and intense. Sundet and Abdelwahed told the employees about the one-third bonus. Sundet admitted that the brochures and handouts had used "very, very sloppy terminology, 'nearly 50%,' because from day one, there's been a deductible and that 'nearly' was very sloppy." At several points Sundet stated that he was ultimately responsible for the "sloppy terminology." He acknowledged that the employees understood they were getting 50 per cent of the pretax profits rather than 33 per cent and that he should have told the employees about the one-third bonus a long time ago. Abdelwahed stated that profit sharing had

never been 50 per cent and for 1979 profit sharing was only 26.6 per cent.[11]

Following the December meeting the plaintiffs initiated this class action charging Century Mfg., Sundet, Peterson, Weber, and Louise Sundet with violation of fiduciary duties under ERISA, 29 U.S.C. §§ 1104, 1105, breach of contract, and fraud. After over six weeks of trial, the District Court found for the plaintiffs on all claims, awarding $9,042,015 in compensatory damages and $500,000 in punitive damages. It also awarded the plaintiffs $162,739 in attorneys' fees and $15,715 in costs under ERISA.

## II. Liability

### A. Fraud

The District Court found that Century's repeated statements that it was contributing "nearly 50%" of pre-tax profits to profit sharing were false. On appeal the defendants advance two lines of argument designed to show that this representation was not false. First, they argue that it was perfectly permissible under generally accepted accounting principles (GAAP) for Century to deduct an unpaid bonus as an expense, and hence the employees actually got more than 50 per cent. of the profit sharing. Second, they argue that even if the bonus is not deductible the employees got more than 50 per cent. of the profits as measured by accepted methods for calculating pre-tax corporate profits. A close look at these arguments reveals that they will not hold water.

Several of the defendants' accounting experts testified that it was permissible under GAAP for an employer to deduct an unpaid bonus. From 1965 through 1976 the profit-sharing plans operated under the initial definition of "corporate profits" contained

10. Several employees tape-recorded this meeting. One such tape and a transcript of it are in evidence.

11. The defendants argue that the District Court erred in treating the December and October admissions as "binding" because these admissions were based on a mistaken understanding of the facts. We do not believe that the District Court gave undue weight to these admissions.

The admissions certainly furnish strong support for the conclusion supported by the vast majority of other evidence that the "nearly 50%" representation was a deliberate falsehood. Further, as our analysis below indicates, we do not accept the defendants' assertion that these admissions were based on a mistaken understanding of the facts.

in the 1965 retirement plan. This definition allowed for the deduction of bonuses but did not specify whether they must be paid or merely accrued. In 1976, the definition of profits for cash profit sharing was amended to allow for the deduction of unpaid bonuses. This definition was extended to retirement profit sharing in 1979. On the assumption that it was permissible to deduct the unpaid bonuses under GAAP, defendants argue that Century actually paid more than its 50 per cent. share to the plans.

This argument suffers from two critical defects. First, even if it were permissible to deduct unpaid bonuses at least from 1976 through 1980, the fact is that the defendants have failed to show that these unpaid bonuses were properly accrued. They do not and presumably cannot point to any bookkeeping entries that show that the bonuses were accrued to an account of Sundet. Such accrual would have important tax and accounting ramifications and thus requires full documentation. Since the bonus deductions were neither paid nor accrued, they in effect served as a subterfuge for the corporation to increase the amount of profit it retained and decrease the amount of profit it contributed to profit sharing. Indeed, the 1976 Board resolution bluntly stated that the purpose of the one-third bonus was "to provide working capital for the growth of the company." In other words, the so-called "bonus" was not a bonus at all, as that term is commonly understood, but simply a decision to retain as working capital a certain amount of profits.

Second, the argument proves too much. If defendants are right, the Board could have voted a 99 per cent. unpaid bonus to Sundet every year, and could still tell the employees without misrepresentation that they were receiving 50 per cent. of profits. Where, as here, the method of calculating profits is irregular and inconsistent with a common-sense reading of the definition contained in the plan itself, the employer has an obligation to inform the employees about this irregularity and its impact. The defendants argue that imposing such a duty to inform would place an excessive burden on the employer to inform employees about such routine things as the method of depreciation. This concern is greatly exaggerated. Generally, insofar as the accounting methods used conform with normal accounting practices and the natural meaning of the words of the plan, the corporation does not have a duty on its own initiative to inform the employees about its method of determining pre-tax profits.

The defendants also argue that the "nearly 50%" representation is not false because under accepted methods of determining pre-tax profits Century did in fact contribute more than 50 per cent. of its profits to profit sharing. The fallacy of this argument is easy to see by looking at one of the methods of calculating pre-tax profits that defendants proffer, the so-called bottom line (line 30) on the corporate tax return, IRS Form 1120. They assert that this bottom-line figure indicates pre-tax profits for profit-sharing purposes. Yet it is undisputed that this figure was arrived at by previously deducting the amounts the corporation contributed to the retirement and cash profit-sharing plans, as well as state income taxes. Thus, under defendants' approach, the amount of profit sharing is derived by taking 50 per cent. of the net profit minus a deduction for the amount of profit sharing and the amount of state income taxes.[12] Not only does this theory run contrary to common-sense ex-

---

**12.** Under defendants' approach, the deduction of the amount of profit sharing has itself the mathematical effect of reducing the amount of profit sharing to one-third of the net profits. This can be shown by simple algebra: Let PS = the amount of profit sharing; DPS = the deduction for profit sharing (including both plans); NP = net profits, excluding any deduction for profit sharing or taxes.

According to the defendants,
$(NP-DPS) \times 50\% = PS$
Assuming DPS = PS
$(NP-PS) \times 50\% = PS$
$NP-PS = 2PS$
$NP = 3PS$
$PS = NP/3$
$PS = 33.3\% \times NP$

**1302**

pectations about how pre-tax profits would be determined, it is directly contrary to the definition of "corporate profits" stated in the 1965 plan. That plan provides that deductible expenses "shall not ... include the Employer's contribution to the Plan nor include state or Federal income or excess profits taxes."

In attempting to show that the "nearly 50% representation is not false, the defendants also launch an attack on the method the District Court used to determine pre-tax corporate profits. The District Court relied on the testimony of the plaintiffs' experts, who determined "corporate profits" by taking the figure on the bottom line of Form 1120, adding to this the deduction for retirement profit sharing, the deduction for state income taxes, the amount of cash profit sharing paid, and subtracting from this the $50,000 exclusion provided for in the amended plan. Defendants argue that this method is a hybrid of GAAP procedures and the "historical formula," and ought not to be legally imposed upon them.

The District Court allowed the $50,-000 exclusion to be deducted, but not the one-third "bonus," because the plaintiffs conceded that they knew about this exclusion, if not its exact amount, but asserted that they did not know about the one-third bonus. Since the plaintiffs did not object to the $50,000 exclusion, the District Court acted properly in relying on this exclusion in calculating damages. The Court, as we have already noted, also acted properly in refusing to deduct the one-third bonus, since the employees were not informed about this substantial and irregular deduction.

Defendants also argue that the District Court's finding that the defendants detrimentally relied on the "nearly 50%" representation is clearly erroneous. Logically, evidence of detrimental reliance must show that the plaintiffs took action, resulting in some detriment, that they would not have taken had they known that they were

getting only one-third of corporate profits. Ample evidence supports the District Court's finding. The defendants' argument assumes that each person must be able to spell out exactly what job opportunities he gave up or what extra work he did on account of the misrepresentation. Such direct evidence is unnecessary. Here reliance can be inferred from the defendants' countless representations that the profit-sharing program provided a strong incentive for the employees to do extra work and to stay with the company. The following are but a few examples of the defendants' representations.

In a 1971 letter to all employees, Sundet and Peterson stated: "if we all do the best job we possibly can, our profit sharing for next year can surpass that of this year. How far we surpass it depends on you." In numerous resolutions, the Century Board of Directors recognized the importance of profit sharing as "an incentive for its full-time employees." In a 1972 letter to all employees, Peterson and Sundet again stated: "The responsibility of every employee is to do his or her share to help the company prosper in order to maximize the profit sharing benefits for all eligible employees." A 1975 company brochure given to all employees stated: "As [the profit-sharing program] grew and Century employees came to understand its many benefits, the program became a strong employee incentive." In an April 1980 press release, Sundet stated: "Our employees understand that they must first put in the effort in order to take out the reward and this year's record profit sharing is truly representative of the outstanding effort that they put in this year." At the December 1980 plant meeting Sundet conceded that one of the larger incentives for anyone to stay with the company or to work hard was to get 50 per cent. of the profits.

In summary, we hold that the record strongly supports a finding of fraud and affirm the District Court's finding.[13]

13. Our discussion of the fraud claim also shows that defendants broke their contract with the    employees.

In reaching this conclusion we do not impose upon defendants any rule of law about profit sharing or accounting practice. We merely hold them to their word.

### B.  Breach of fiduciary duty under ERISA

The District Court found that Sundet, Weber, Louise C. Sundet, Peterson, and Century violated their duties as fiduciaries under 29 U.S.C. § 1104 [14] and that all of the above parties except for Century violated their fiduciary duties under 29 U.S.C. § 1105.[15]

■ Given the above facts and the finding of fraud, there can be no serious question that the fiduciaries of the retirement plan violated their duties under Sections 1104 and 1105. None of these fiduciaries denies that he or she knew or should have known that 50 per cent. of the profits were supposed to be contributed to the profit-sharing plans, and that in fact only one-third of the profits were so given. Because the amount of the employer's contribution to the retirement plan depended in part on the amount of its contribution to the cash profit-sharing plan, the company's failure to contribute 50 per cent. of its profits to profit sharing resulted in a shortage to the retirement plan as well as to the cash plan. These fiduciaries either directly participated in that fraud or failed to take action to remedy it.

■ Defendant Weber argues that he was not a fiduciary with respect to the retirement plan. Under 29 U.S.C. § 1002(21)(A), subject to exceptions that do not apply here,

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

The District Court's finding that Weber exercised discretionary authority with respect to the administration or management of the retirement plan is supported by the record. Weber helped work on the amendments made to the plan in 1976. He was largely responsible for informing employees about both plans. He met with the company's independent accountant to discuss the issue of officially recognizing the one-third bonus. He consulted on plan investments and had the authority to make some press releases without Sundet's prior approval. See *Eaves v. Penn,* 587 F.2d 453, 457–59 (10th Cir.1978) (officer and director who gave investment advice held to be fiduciary).

### III.  Compensatory Damages

The defendants argue that the amount of damages should be reduced in light of the following six factors: [16]

**14.** Section 1104(a)(1)(B) requires a fiduciary to a plan to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ...."

**15.** Section 1105(a) provides:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
(1) if he participates knowingly in or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;  or
(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**16.** The District Court found Century Mfg. Co., Sundet, Louise Sundet, Peterson, and Weber jointly and severally liable in the following amounts: Century Mfg. Co.—$9,302,015; Leland Sundet—$9,302,015; Donald Weber—$7,559,754; Louise Sundet—$8,646,805; Clemens E. Peterson—$5,438,114. The Court then reduced the liability for each defendant by

1. The owners' participation in profit sharing. The defendants contend that the owners were entitled to receive a portion of the profit sharing and that the amount of damages should be accordingly reduced. Specifically, they argue that Peterson is entitled to receive profit sharing for the time he owned one-half of the company, in 1971–72, and that Sundet is entitled to receive profit sharing during the entire period from 1971–80. The plaintiffs contend that neither owner actually participated in profit sharing and that the employees were told on several occasions that the owners did not participate.

■ The record shows that the owners were not participants in profit sharing. Therefore the District Court was correct in refusing to reduce the damages to account for the owners' alleged share of profit sharing. As in the case of the one-third "bonuses," profit sharing was not paid to either owner, although bookkeeping entries show deductions were made every year for the owners' portion. These deductions again served as a subterfuge for the company to increase its share of the profits and decrease its contribution to profit sharing. At no time did the company tell the employees that a special deduction was being made in the amount of what would have been the owners' share if, contrary to fact, they actually had participated. To establish their right to profit sharing, the owners must either have been paid the profit sharing or at least have had it credited to their accounts. Since neither was done, the money stayed in the company.

2. The managers' portion of profit sharing. The defendants also argue that certain managerial employees were entitled to profit sharing and that the damages should be reduced by this amount. This argument refers to the profit sharing that Weber was allegedly entitled to from 1971–80 and Peterson from 1972–78. Again, defendants did not present any evidence to show that either man was paid profit sharing or that

their accounts were so credited. Thus, for the reasons stated above, the District Court properly refused to make this reduction in damages.

■ 3. The increase in profitability resulting from the company's failure to pay 50 per cent. of profits in profit sharing. The defendants' experts testified that the amount of profit sharing for succeeding years would have been lower if the company had actually paid out 50 per cent. of the profits. They argue that the additional payments would have reduced profits in later years because less money was available for investment in plant and equipment. This analysis is based on the assumption that a decrease in assets automatically results in a proportionate decrease in the amount of profits. The assumption is questionable. The company, for example, might not have invested the additional money in the business. Other sources of funds could have been available. Still, there is a substantial probability that profits were increased by the retention of additional working capital. The District Court did not make any finding explicitly addressing this issue, and it is appropriate to remand for such a finding.

■ 4. Inclusion of the profit-sharing shortage from 1980. The defendants argue that since the profit sharing for a year is not determined until the end of that fiscal year, and the employees knew about the one-third bonus before the profit sharing for 1980 was determined, the shortage in profit sharing for 1980 should not be included. This argument overlooks the fact that the employees worked the entire 1980 fiscal year in reliance on the representation that they would receive 50 per cent. of the profits for their work. They did not find out the truth until they had already completed their 1980 work.

■ 5. The effect of the Nixon wage-and-price controls on profit sharing in 1972–73. The defendants argue that federal wage-and-price controls limited the

$260,000, which is the settlement amount paid to the plaintiff class by the independent accounting firm.

amount of profit sharing that the company could pay in 1972 and 1973. Since the District Court did not explicitly address this issue, we again remand for a finding as to whether the Nixon wage-and-price controls would limit the amount that the defendants could contribute to profit sharing for these years.

■ 6. Inclusion of profit-sharing shortages for years prior to the existence of the dollar-bill diagram. The defendants argue that since the dollar-bill diagram was not distributed to the employees until 1975, they should not be held liable for damages from 1971–74. This argument overlooks the fact that prior to the dollar-bill diagram, from 1971 through 1974, the employees were told that the company was contributing nearly 50 per cent. of the profits to profit sharing.

## IV. Punitive Damages and Judicial Bias

■ The District Court awarded $500,-000 in punitive damages for the defendants' fraud. The defendants argue that the evidence does not show that Sundet willfully set out to defraud the employees. We disagree. In 1979 Sundet insisted on making a speech to the American Council on Profit Sharing stating that 50 per cent. of the profits were given to employees, even though his own director of operations had warned that this was a misrepresentation. In October 1980 Sundet confessed to a management group that the 50 per cent. representation was a deliberate falsehood. In December 1980 Sundet told the entire assembly of Century employees that the 50 per cent. representation was "wrong" and that he knew that the employees thought they were getting 50 per cent. of the profits without a one-third "bonus" being deducted.

■ The defendants also charge the District Court with being biased in favor of the plaintiffs. Our perusal of the record does not even remotely support this charge. The District Court showed great restraint in remaining dispassionate and fair in the face of the defendants' continuous objections, the vast majority of which were entirely without merit.

## V. Attorneys' Fees

■ The defendants raise several objections to the District Court's award of attorneys' fees and costs under ERISA. They argue that the Court erred in three respects: (1) in finding that the plaintiffs spent 30 per cent. of their time on matters that related to the ERISA claim, (2) in failing to eliminate hours charged for the presence of more than one attorney at depositions and hearings, and (3) and in failing to eliminate "excessive" hours spent in the preparation for depositions. On these matters we defer to the judgment of the District Court. It is familiar with the lawyers, the evidence, and the complexity of the issues, and thus most able to determine the reasonableness of the hours charged. The District Court's rulings were reasonable and not an abuse of discretion.

The judgment as to liability and the basic computation of damages is affirmed. The cause is remanded to the District Court for reconsideration of the damage award in light of the possible impact that profit-sharing payments would have had on future profits and the limitations imposed by federal wage-and-price controls in 1972 and 1973. Plaintiffs are awarded their costs in this Court.

It is so ordered.