Robert ANDERSON, Jr., et
al., Appellants,

v.

ALPHA PORTLAND INDUSTRIES, INC.,
formerly known as Alpha Portland Ce-
ment Company, Insurance and Health
Plan for Hourly Employees, The Eq-
uitable Life Assurance Society of the
United States, Appellees,

v.

INTERNATIONAL BROTHERHOOD OF
BOILERMAKERS, CEMENT, LIME,
GYPSUM & ALLIED WORKERS DI-
VISION OF INTERNATIONAL BOIL-
ERMAKERS, Charles F. Fuch, Charles
C. Huntbach, (Third Party Defendants
Below),

United States of America,
(Intervenor Below).

No. 86–2483.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 15, 1987.

Decided Jan. 13, 1988.
Rehearings and Rehearings En Banc
Denied March 14, 1988.

Sheldon Weinhaus, St. Louis, Mo., for appellants.

Michael Biggers, New York City, for appellees.

Before McMILLIAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BEAM*, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Plaintiffs appeal from the judgment of the district court[1] in favor of Alpha Portland Industries, Inc. (Alpha) and The Eq-

uitable Life Assurance Society of the United States (Equitable) in this case involving the Employee Retirement Income Security Act (ERISA) and the Labor Management Relations Act (LMRA). Plaintiffs are a class of former, now retired, hourly employees of Alpha's cement division. This suit developed from Alpha's decision to terminate all retiree health and life insurance benefits on May 1, 1982 when the existing collective bargaining agreement (CBA) expired. Plaintiffs alleged that the welfare benefits were vested lifetime benefits which could not be terminated. After a four day bench trial the district court found that the benefits were terminable because the parties to the CBA intended that the benefits only last for the duration of the CBA. 647 F.Supp. 1109 (E.D.Mo.1986). For the reasons stated below we affirm.

## I. BACKGROUND

In 1946 Alpha unilaterally created a group insurance plan for active hourly employees. In 1948 it extended limited coverage to future retirees. From 1946 through 1955 there were no formal plan documents but there were booklets describing the benefits. The 1948 booklet stated that the plan was to take effect on November 1, 1948 and that Alpha hoped "to continue the Plan indefinitely but reserves the right to change, modify, or discontinue it if future conditions make such action necessary or if reduction of Company earnings make it impossible to continue." In 1950 and 1952 the plan was revised, but each new plan contained the continuation statement found in the 1948 version.

Beginning in 1955, the terms of the plan became subject to bargaining between Alpha and the International Cement, Lime, Gypsum, and Allied Workers Union. The 1955 CBA stated that the "Group Insurance Program currently in effect shall continue in effect for the period" of the agreement. The CBA also stated that it was subject to renewal each year unless either

* The Honorable C. Arlen Beam, United States Chief District Judge for the District of Nebraska at the time this case was submitted, has since been confirmed as a Circuit Judge of this court.

1. The Honorable William C. Hungate, United States District Judge for the Eastern District of Missouri.

party gave notice sixty days prior to its expiration date. The 1956, 1957, and 1958 CBAs each provided that benefits were limited to the duration of the agreement. Further, the 1956 plan booklet stated that Alpha reserved "the right to change, modify, or discontinue" the plan.

The 1959 through 1963 CBAs contained provisions stating that "the Group Insurance Plan currently in effect shall be amended" as provided. The amendments did not affect retirement benefits and contained no language relating to their duration. However, the duration of the entire agreement was limited to one year. In 1959 a booklet was issued describing the benefits of the major medical insurance plan. The booklet stated that the group insurance contract between Alpha and The Equitable Life Assurance Society of the United States "may be altered or discontinued." The CBAs covering the period from 1963 to mid–1965 were substantially similar to those covering the previous four year period.

During negotiations over the 1965 CBA, union representatives submitted a proposal that retiree benefits be paid to the spouse and dependents of the retiree after the death of the retiree, but Alpha rejected it. Thereafter an agreement was entered into which stated that the plan currently in effect would remain in effect until the effective date of the amendments. One of the amendments stated: "Future retirees' life insurance, increased from $2,000 to $2,500. For future retirees, Company will pay full costs of all group insurance for them and their dependents *until death of retiree.*" (Emphasis added). Union negotiators believed that this clause guaranteed insurance benefits for the life of the retiree, but Alpha's negotiators understood the phrase to mean that benefits would not be paid to dependents after the retiree's death.

Beginning in 1967 the CBA existed in the form of a Basic Agreement and was supplemented by Local Agreements. The 1967 Basic Agreement became effective May 1, 1967 and continued until May 1, 1969. On the expiration date the agreement would renew itself for one year unless sixty days

written notice was given by either party. The 1967 agreement provided that the plan currently in effect would remain in effect until May 1, 1968, at which time the attached amendments would take effect. The 1969 and 1971 agreements were substantially similar to the 1967 agreement.

Beginning in 1973 the CBAs contained, as an appendix, a separate Insurance and Health Agreement (I & H Agreement) that contained the terms of the plan. Each I & H Agreement was prepared by the Personnel Manager of Alpha's cement division, Robert J. Bonstein, and sent to the Union for approval. The 1973, 1975, and 1978 CBAs each provided that the plan in effect at the expiration date of the previous agreement was to be amended as provided in the I & H Agreement. The 1973 I & H Agreement expressly stated:

This Insurance Agreement shall become effective May 1, 1973, and shall continue in effect until May 1, 1975, during which period neither the Company nor the Union may demand any change in its provisions.

After May 1, 1975, the Insurance Agreement shall be automatically renewed for successive one-year periods unless either party to the Agreement has given written notice to the other at least sixty (60) days prior to May 1, 1975 (or any subsequent anniversary of the Effective Date of the Collective Bargaining Agreement) of its desire to amend or modify this Agreement.

Both the 1975 and 1978 I & H Agreements contained duration clauses identical to the 1973 clause, except that the dates were different—the 1975 agreement was effective until May 1, 1978 and the 1978 agreement was effective until May 1, 1981.

Article I of the 1973, 1975, and 1978 I & H Agreements stated that retiree insurance benefits could be altered:

Insurance coverages under the Prior Programs not hereinafter provided shall be continued to the extent applicable to Retirees and their Dependents in accordance with the provisions of the Prior Programs as if fully set out herein and as the same may now or hereinafter be

amended, modified or supplemented in collective bargaining between the parties.

Also, each agreement provided for coordination of benefits whereby the benefits Alpha paid were reduced by amounts retirees received from other sources such as Medicare.

In 1978 hourly employees were provided a summary plan description (SPD) for the plan. The SPD provided, in part, that "[i]f you retire with 10 or more years of service on or after May 1, 1976, you will continue to receive the Hospital/Surgical and Major Medical portion of plan coverage. *Coverage will continue for the remainder of your life.*" (Emphasis added). The SPD also provided that retirees with 10 or more years service "will continue to receive $4,000 in Company-sponsored life insurance."

On April 31, 1981 the 1978 CBA with the attached I & H Agreement was due to expire, but the parties agreed to extend the existing terms for an additional year. During this period Alpha was experiencing increasing financial difficulties. Alpha's cement division had an operating loss of almost $17 million in 1980 and 1981. Total losses, including plant closings, exceeded $60 million. In 1981 Alpha closed four of its cement plants and by the end of 1982 all of its cement plants were closed.

On March 29, 1982 Alpha sent letters to all of its retired hourly employees stating that it was cancelling their insurance coverage as of May 1, 1982, following the expiration of the current CBA and I & H Agreement. On May 1 Alpha ceased providing insurance benefits for retirees.

Plaintiffs brought suit in the United States District Court for the Eastern District of Missouri alleging violations of ERISA and the LMRA. The district court dismissed the case, holding that plaintiff's claims are subject to arbitration, 558 F.Supp. 913 (E.D.Mo.1982). A panel of this court reversed, 727 F.2d 177 (8th Cir.1984), and upon rehearing en banc the district court again was reversed and the case remanded for trial. *Anderson v. Alpha Portland Industries, Inc.*, 752 F.2d 1293 (8th Cir.) (*Anderson I*), cert. denied, 471 U.S. 1102, 105 S.Ct. 2329, 85 L.Ed.2d 846 (1985).

During the four day bench trial, the district court heard conflicting testimony about whether retiree benefits were vested for the lifetime of the retiree. Aside from the language in the plan documents, summarized above, the district court also heard other evidence on the issue of intent. For example, union members, including those involved in negotiating the 1975 and 1978 agreements, testified that they had been told by a now deceased Alpha representative that their retirement benefits lasted for life. Plaintiffs introduced into evidence letters drafted by Bonstein and sent to new retirees which stated that "[y]our life insurance will be continued in the amount of ———. * * * Alpha group hospital and surgical insurances for you and your eligible dependents will be continued. * * * Major medical expense benefits will be provided up to a lifetime maximum of ———."

Evidence was produced by Alpha showing that after 1975, the effective date of ERISA, if retiree benefits were to extend beyond the duration of the CBA, it was customary for the plan documents to explicitly state this. Also, International Union President Thomas Miechur (by deposition) and Bonstein testified that under the language they prepared and agreed upon, retiree welfare benefits were not guaranteed beyond the expiration of the CBA.

Miechur's position was corroborated by letters he sent to retirees following Alpha's decision to terminate benefits:

The termination of the retirees' insurance coverage by the company is a traumatic experience for all retirees. I fully understand the impact the termination of insurance benefits has on retirees, and I wish there was something that could be done to provide continued coverage, but under the circumstances there is nothing that the Union can do. There is nothing in the collective bargaining agreement itself, or in the Insurance and Health Agreement which guarantees retirees' benefits for life, nor is there any language in these agreements that talks

about vesting of these benefits, and these benefits will expire of their own force on May 1, 1982.

Pensions, unlike health and welfare benefits, are paid from an actuarially predetermined fund and are guaranteed for life. Health and welfare benefits are negotiated periodically and are paid for by the employer contributions and last only for the life of a collective bargaining agreement.

The district court weighed this and other evidence and concluded that retiree welfare benefits were not vested for life and entered judgment in favor of Alpha. The court further held that Equitable was not a necessary party to the lawsuit and entered judgment in its favor.

## II. DISCUSSION

On appeal plaintiffs raise numerous issues which fall into four general categories. They argue that: 1) the district court erroneously concluded that retiree health and life insurance benefits were not vested for the lifetime of the retiree; 2) the district court erroneously deprived them of a jury trial; 3) the district court committed several errors when conducting the proceedings; and 4) the district court erroneously concluded that Equitable is not a necessary party.

### A. Duration of Benefits

■ In 1974 the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* (1982), was enacted to "protect interstate commerce and the interests of participants in employee benefit plans" by establishing disclosure and reporting requirements, standards of conduct for plan fiduciaries, and access to federal courts. 29 U.S.C. § 1001(b). "Employee benefit plans" are divided into two distinct categories: welfare plans and pension plans. In general, welfare plans are maintained to provide "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment * * * *" 29 U.S.C. § 1002(1). Pension plans, however, "(i) provide[ ] retirement income to employees, or (ii) re-

sult[ ] in a deferral of income by employees for periods extending to the termination of covered employment or beyond * * * *" 29 U.S.C. § 1002(2)(A).

Aside from the difference in their purposes, welfare and pension plans also differ in another critical way. While pension plans are subject to ERISA's stringent vesting requirements, 29 U.S.C. § 1053 ("[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age"), welfare plans are specifically exempt from such requirements. 29 U.S.C. § 1051. *See generally Anderson v. John Morrell & Co.*, 830 F.2d 872, 876 (8th Cir.1987).

■ Since welfare benefits do not automatically vest as a matter of law, *see, e.g., Molnar v. Wibbelt*, 789 F.2d 244, 250 (3rd Cir.1986), we must determine whether "the parties intended [that] retirees' benefits would be vested and not tied to the agreement which created them." *UFCW Local 105–A v. Dubuque Packing Co.*, 756 F.2d 66, 70 (8th Cir.1985). The exemption from ERISA's vesting requirements does not prohibit an employer from extending benefits beyond the expiration of the collective bargaining agreement. Rather, the exemption allows the parties to determine the duration of the welfare benefits. Thus, the issue is "simply one of contract interpretation." *Id.*

■ Plaintiffs argue that once they showed that retirees were given welfare benefits, Alpha had the burden of showing that the benefits were for a limited duration. Plaintiffs principally rely on the decision of the Sixth Circuit in *International Union, United Auto., Aero., and Agric. Implement Workers of America v. Yard–Man, Inc.*, 716 F.2d 1476 (6th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). In *Yard–Man* the court stated that:

retiree [welfare] benefits are in a sense 'status' benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained. *Thus, when the parties contract for benefits which accrue upon*

*achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.* This is not to say that retiree insurance benefits are necessarily interminable by their nature. Nor does any federal labor policy identified to this Court presumptively favor the finding of interminable rights to retiree insurance benefits when the collective bargaining agreement is silent. Rather, as part of the context from which the collective bargaining agreement arose, the nature of such benefits simply provides another inference of intent. Standing alone, this factor would be insufficient to find an intent to create interminable benefits. In the present case, however, this contextual factor buttresses the already sufficient evidence of such intent in the language of this agreement itself.

*Id.* at 1482 (emphasis added).

We disagree with the plaintiffs for several reasons. First, assuming we recognize an inference in favor of vesting, the burden of proof still remains on the plaintiffs. Shortly after *Yard–Man* was decided the Sixth Circuit stated that "there is no legal presumption based on the status of retired employees." *International Union, United Auto., Aero. and Agric. Implement Workers of America v. Cadillac Malleable Iron Co.*, 728 F.2d 807, 808 (6th Cir.1984). Inferences do not shift the burden of proof.

Second, we disagree with *Yard–Man* to the extent that it recognizes an inference of an intent to vest. Congress explicitly exempted welfare benefits from ERISA's vesting requirements. It, therefore, seems illogical to infer an intent to vest welfare benefits in every situation where an employee is eligible to receive them on the day he retires. The court in *Yard–Man* recognized that no federal labor policy presumptively favors vesting. Because Congress has taken a neutral position on this issue "traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies." *Yard–Man*, 716 F.2d at 1479. We believe that it is not at all inconsistent with labor policy to require plaintiffs to prove their case without the aid of gratuitous inferences. Further, our holding today is consistent with previous opinions of this court. For example, in *Morrell*, this court stated that:

> The gist of [plaintiff's] claim is that the employer's oral statement to individual employees of its "policy" became a contract to maintain and improve the plan when the employees thereafter performed service. Yet if that be so, it would equally follow that an employer's announcement of any plan to pay welfare benefits would become a contract to maintain the plan indefinitely upon the performance of service by employees. Congress, however, did not intend that result. Doubtless it is consistent with the intent of Congress for an employer to undertake such an obligation if it elects to do so. We conclude, however, that to accomplish that result, there must be a specific, if not written, expression of the employer's intent to be bound.

830 F.2d at 877. *See also Dubuque Packing*, 756 F.2d at 70 (burden is on plaintiff to prove that benefits are vested).

Proper allocation of the burden of proof in this case leads to the conclusion that the district court correctly held that retiree welfare benefits were intended to last only for the duration of the CBA.

It is axiomatic that when interpreting a contract, or in this case a CBA, we must begin by examining the language of the documents which form the basis of the agreement. *See Yard–Man* 716 F.2d at 1479. "[I]f the contract is deemed ambiguous, then the court may weigh extrinsic circumstances to aid in its construction." *Dubuque Packing*, 756 F.2d at 69. Because the district court considered extrinsic evidence, we will assume the court found the language in the documents ambiguous.

Plaintiffs' argument that retiree welfare benefits were vested falls into two categories: pre–1973 agreements and post–1973 agreements.

### 1. Pre–1973

Prior to 1973, retiree welfare benefits were provided for by the CBA although the

actual terms were contained in group insurance policies. Plaintiffs focus on the language in the 1965 CBA which stated that "[f]or future retirees, Company will pay full costs of all group insurance for them and their dependents until death of retiree." Viewed in a vacuum this language is highly probative of intent to vest benefits, but when viewed in the context of the events surrounding its adoption it is less significant. At trial Alpha produced evidence showing that the phrase reflected Alpha's rejection of a union proposal that retirees' dependents' benefits would be continued beyond the death of the retiree.[2] Further evidence showed that during the term of the 1965 CBA five Alpha local unions agreed to coordination of benefits with Medicare. The agreement applied to persons already retired and thus was inconsistent with plaintiffs' theories of vesting.

Aside from the phrase "until death" in the 1965 CBA, no credible evidence of intent to vest exists in the pre–1973 period. From 1946 through 1955 Alpha "reserve[d] the right to change, modify, or discontinue [the group insurance plan] if future conditions make such action necessary or if reduction of Company earnings make it impossible to continue." The 1956, 1957, and 1958 CBAs limited benefits to the duration of the agreement and the 1956 Plan Booklet stated that Alpha reserved the right to discontinue the plan. The 1959 through 1963 CBAs each had a one year duration and a booklet issued in 1959 stated that the group insurance plan "may be altered or discontinued." The 1967, 1969, and 1971

Basic Agreements also were of limited duration. In short, nothing prior to the adoption of the I & H Agreements proves that vesting was intended.[3]

## 2. Post–1973

Beginning in 1973 retiree welfare benefits were embodied in I & H Agreements which were appended to the CBA. The relevant portions of these agreements are set forth in the factual statement. The district court held that the agreements reflect an intent to limit benefits to the duration of the then effective agreement because each agreement: 1) states that benefits previously provided would be continued; 2) provides that its terms are subject to amendment, modification, or supplementation at later bargaining sessions; 3) has an explicit duration clause limiting its duration; and 4) contains a coordination of benefits clause which is inconsistent with a theory of vesting. 647 F.Supp. at 1126–27. We agree with each of the district court's conclusions.

First, we agree that *Dubuque Packing* is distinguishable. In *Dubuque Packing* the 1973 and 1976 agreements reaffirmed and continued the retiree benefits established in the previous agreements. However, although the 1979 agreement did not contain reaffirmation and continuation language, the company continued paying the benefits of pre–1979 retirees. This court found that the continuation of benefits was evidence that the benefits were vested. In the present case, however, each I & H Agreement provided for continuation of benefits

---

**2.** This construction is not inconsistent with *Policy v. Powell Pressed Steel Co.,* 770 F.2d 609 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986), wherein a district court's interpretation of similar language was overturned on appeal. In *Policy* the agreement provided for the continuation of benefits "for the pensioner and his spouse, if any, during the life of the pensioner at no cost to the pensioner." *Id.* at 616. The district court interpreted the phrase to cut off dependent coverage at the pensioner's death rather than guarantee lifetime benefits to the pensioner. The Sixth Circuit disagreed because the district court's interpretation would have lead to the anomalous result that the spouse would receive benefits at no cost while the pensioner would have to pay. *Id.*

The result reached in the present case, however, presents no such problems.

**3.** Plaintiffs note that during two strikes Alpha continued to pay retiree welfare benefits. While payment of benefits during a strike may show that benefits were thought to be vested, *Bower v. Bunker Hill, Co.,* 725 F.2d 1221, 1225 (9th Cir.1984), the facts in this case do not support such a conclusion. During the 1957 strike, benefits were continued for retirees as well as for all striking employees. Similarly, in 1965 some of the striking employees were also provided benefits during the strike. The fact that Alpha treated retirees and striking employees equally negates any inference of intent to vest retiree benefits.

from the previous plan. Were there an intent to vest, continuation language would not be necessary. *See International Union (UAW) v. Roblin Industries,* 561 F.Supp. 288, 298 (W.D.Mich.1983).[4]

Second, the provision of the I & H Agreement allowing amendment, modification, or supplementation is inconsistent with plaintiffs' argument that benefits were vested for life. *See Struble v. New Jersey Brewery Employees' Welfare Trust Fund,* 732 F.2d 325, 330 (3rd Cir.1984).

Third, the specific durational clauses in the I & H Agreements show an intent to limit benefits to the duration of the agreement. It would render the durational clauses nugatory to hold that benefits continue for life even though the agreement which provides the benefits expires on a certain date. Plaintiffs argue that benefits are non-terminable because the word "terminate" does not appear. However, they cite nothing to support this argument.[5] The question before us is not whether any specific words appear, but whether the parties intended benefits to vest. Intent, or lack thereof, may be proved in more ways than one, and the absence of the word "terminate", while relevant to our inquiry, certainly is not dispositive. *See Struble,* 732 F.2d at 330–31 (benefits expired at end of agreement even though the word "terminate" did not appear in agreement).

Fourth, coordination of benefits is inconsistent with vesting. When interpreting a contract we must not interpret one provision inconsistently with another. *Yard-Man,* 716 F.2d at 1479–80. The coordination of benefits provision in the I & H Agreements reduces benefits to be paid to all retirees. We agree with the district court that "the Plan cannot be interpreted to provide vested rights for prior retirees in

one provision and to take such rights away in another." 647 F.Supp. at 1127.

Plaintiffs also rely on the statement in the 1978 SPD that "[c]overage will continue for the remainder of your life." The district court held that based on the clarity of later I & H Agreements and the conduct of the parties, very little weight would be given to the statement. 647 F.Supp. at 1127. Because the district court's interpretation was based largely on the credibility of the witnesses presented by both parties, and because plaintiffs have not convinced us that the district court erred, we believe that the court correctly held that the 1978 SPD statement is not controlling in light of substantial contra evidence showing no intent to vest benefits.

■ Plaintiffs further argue that they are entitled to recover under the 1978 SPD alone, independent of the CBAs and I & H Agreements. They base their claim on 29 U.S.C. § 1022 which provides, in pertinent part:

(a)(1) A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title. The summary plan description shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.

\* \* \* \* \* \*

(b) The plan description and summary plan description shall contain the following information: \* \* \* circumstances which may result in disqualification, ine-

---

**4.** Plaintiffs erroneously cite *Upholsterers' Int'l Union v. American Pad & Textile Co.,* 372 F.2d 427 (6th Cir.1967), for the proposition that language providing for continuation of prior programs indicates an intent to vest. The case merely states that the word "continue" as used therein was ambiguous and needed to be supplemented by extrinsic evidence.

**5.** Plaintiffs contend that this court in *Dubuque Packing* demanded that the phrase "terminate

retirement benefits" explicitly appear in an agreement before the benefits will be construed as terminable. However, nowhere in the opinion does the phrase "terminate retirement benefits" appear. The closest language—"[t]here is no evidence that the parties agreed to *terminate retirees' benefits*"—falls far short of establishing the bright line test plaintiffs would have us apply in this case. *Dubuque Packing,* 756 F.2d at 69 (emphasis added).

ligibility, or denial or loss of benefits * * * *

Plaintiffs argue that under the 1978 SPD they are entitled to lifetime benefits because 1) the SPD failed to specify the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits" and 2) the SPD guarantees benefits for life.

This court has stated that "[t]o secure relief on the basis of a faulty summary plan description, the claimant must show some significant reliance on, or possible prejudice flowing from the summary." *Lee v. Union Electric Co.*, 789 F.2d 1303, 1308 (8th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 460, 93 L.Ed.2d 406 (1986). *See also Govoni v. Bricklayers, Masons & Plasterers*, 732 F.2d 250, 252 (1st Cir.1984). Plaintiffs argue that these cases are inapposite because the SPD in the present case is not "faulty." We disagree, because to the extent plaintiffs argue that the SPD provides lifetime benefits, and therefore is inconsistent with the I & H Agreements, it necessarily must be faulty. ERISA states that the SPD must "apprise [the] participants and beneficiaries of their rights and obligations under the plan * * * * " If, as plaintiffs argue, the SPD fails to do this, it is faulty.

Plaintiffs further argue that they need not show detrimental reliance to recover under the SPD, citing *Monson v. Century Mfg. Co.*, 739 F.2d 1293 (8th Cir.1984). In *Monson*, this court stated that "[l]ogically, evidence of detrimental reliance must show that plaintiffs took action, resulting in some detriment, that they would not [otherwise] have taken." *Id.* at 1302. The court further stated that reliance could "be inferred from the defendants' countless representations that the profit sharing program provided a strong incentive for the employees to do extra work and to stay with the company." *Id.* Plaintiffs argue that reliance may also be inferred in the present case. We have reviewed the argu-

ments and briefs of the parties and the record before us and conclude that reliance should not be inferred in this case. Plaintiffs direct us to nothing from which reliance may be inferred. We believe that *Monson* is not controlling in the present case because the facts in *Monson* readily supported an inference of reliance. The plaintiffs in *Monson* were repeatedly told that fifty per cent of the company's profits were to be contributed to the employee profit sharing program and that they could directly increase the contributions by working harder. In the present case, however absent some evidence of reliance, it would be improper to infer that any of the plaintiffs relied to their detriment on the SPD.

Finally, contrary to plaintiffs' assertions this case does not involve breach of fiduciary duties [6], unauthorized amendments, or unilateral termination of a benefit plan. It merely involves a decision by Alpha not to renew retiree welfare benefits which by their own terms have expired. The benefits have neither been terminated nor amended; they simply have expired.

**B. Jury Trial**

■ Plaintiffs next argue that pursuant to § 301 of the National Labor Relations Act, 29 U.S.C. § 185, they were entitled to trial before a jury and that under ERISA they are entitled to a jury trial on the separate breach of contract issue. Alpha contends that plaintiffs have no right to a jury trial because their claim is equitable in nature. We need not resolve this dispute because we believe plaintiffs waived any right to a jury trial on the issue of liability. Only if the court found for plaintiffs on the issue of liability would a jury have been required to assess damages. Plaintiffs agreed to a bifurcated trial and that is what they received. Consider the following conversation between the court and plaintiffs' counsel:

THE COURT: Well, the way the court would see it, *the court tries the case. If*

---

**6.** The district court held that plaintiffs did not plead breach of fiduciary duty, 647 F.2d at 1128, and we agree. Further, it would be ludicrous to hold that Alpha breached its fiduciary duties when it discontinued benefits which were no longer required under the applicable agree-

ments. *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir.1986) ("ERISA simply does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued"), *cert. denied,* — U.S. ——, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987).

*there should be no liability, we all go home.* If there is liability, then the court would fashion a remedy as to the part that is equitable and the part that is damages. If he's right in his position, that it's 301 related and it is damages and that there are cases would require— that and that only, on that portion of it, would go to the jury.

PLAINTIFFS' COUNSEL: *That's exactly our position.*

(Emphasis added).

### C. Other Errors

Plaintiffs also argue that the trial judge committed numerous errors when conducting the proceedings below. Only a few of the alleged errors merit discussion and of those, none warrant the relief sought by plaintiffs.

 For example, plaintiffs argue that the court erred in denying their July 3, 1985 motion to amend their complaint. The decision whether to allow amendment of a complaint is left to the sound discretion of the district court and will be reversed only if that discretion is abused. *Niagara of Wisconsin Paper Corp. v. Paper Industry*, 800 F.2d 742, 749 (8th Cir.1986). In the present case plaintiffs' motion was filed more than three years after suit was initially filed, ten days before the then effective discovery cut off date, and two months prior to the projected trial date. Under these circumstances, the district court did not abuse its discretion.

Plaintiffs also argue that the district court set an "oppressive thirty-day schedule" for completion of discovery upon remand. Plaintiffs fail to note, however, that they never sought relief from the schedule set by the court and that when Alpha filed a motion for an extension of time they countered with a motion in opposition.

Further, plaintiffs argue that the district court erred in failing to recuse himself. We have reviewed the allegations made by the plaintiffs and have found nothing indicating that the district court was less than impartial.[7]

Finally, we note that the fifty page limit on the length of briefs filed in this court must be followed. Plaintiffs' counsel's use of 189 single-spaced footnotes in his fifty page brief violates the spirit, if not the letter, of Fed.R.App.P. 28(g) and 32(a) and 8th Cir.R. 8(e). In all cases where additional space is needed, permission of the court should be requested.

## III. CONCLUSION

After careful review of the arguments of the parties, we affirm the judgment of the district court. Plaintiffs failed to carry their burden of proof and prove that retiree welfare benefits were intended to last for the life of the retiree. Also, the district court did not err in denying plaintiffs a jury trial or in conducting the proceedings below.

---

**7.** Plaintiffs other allegations of error have been considered and have been found to be without merit. Also, our disposition of this case makes it unnecessary for us to decide whether the district court correctly dismissed the Equitable Life Assurance Society of the United States.