ANOKA ORTHOPAEDIC ASSOCIATES, P.A.; Anoka Orthopaedic Associates, P.A. Employees' Defined Benefit Pension Plan and Trust; Anoka Orthopaedic Associates, P.A. Employees' Money Purchase Plan and Trust; Dr. Charles J. Cooley; Dr. John E. Wallestad; and Dr. Philip H. Haley, Plaintiffs,

v.

John G. MUTSCHLER, Defendant.

and

Edward J. LECHNER and E.J. Lechner J.D., Ltd., Defendants and Third Party Plaintiffs,

v.

Dr. Charles J. COOLEY; Dr. John E. Wallestad; Dr. Philip H. Haley; Mr. Ronald E. Flo; and, Anoka Orthopaedic Associates, P.A., Third–Party Defendants.

and

Continental Insurance Company and Fidelity Casualty Company of New York, Applicants for Intervention.

Civ. No. 4–86–539.

United States District Court, D. Minnesota, Fourth Division.

March 20, 1989.

Fred M. Soucie, James P. Mulvahill, and Jensen, Hicken, Gedde & Soucie, Anoka, Minn., for plaintiffs.

Phillip A. Cole, and Lommen, Nelson, Cole & Stageberg, Minneapolis, Minn., for Edward J. Lechner and E.J. Lechner, J.D., Ltd.

Robert F. Henson, Roy Ginsburg, and Henson & Efron, Minneapolis, Minn., for defendant John G. Mutschler & Associates, Inc.

J. Richard Bland, and Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, Minn., for third-party defendants.

## ORDER

DOTY, District Judge.

This matter is before the Court on plaintiffs' and defendants' motions for partial summary judgment. Plaintiffs' motion requests the Court to hold that defendant Edward J. Lechner is a fiduciary under the Employee Retirement Income Security Act (ERISA), Pub.L. No. 93–406, 88 Stat. 829 (codified at 29 U.S.C. §§ 1001–1461 (1982) and portions of the Internal Revenue Code). Defendants' motion requests the Court to dismiss all of plaintiffs' ERISA claims on two grounds: (1) that defendants are not fiduciaries and (2) that certain funds that are the subject matter of this lawsuit are not covered by ERISA.[1] The Court denies plaintiffs' motion and grants defendants' motion on the grounds that defendants are not fiduciaries under ERISA, and that most of the services that plaintiffs assert made defendants' fiduciaries fail to bear the requisite causal relationship with the damages alleged in this case. Since the Court's holding disposes of the question of whether ERISA applies to defendants in this case, defendants' second ground need not be addressed.

## FACTUAL BACKGROUND

### I. Undisputed Facts

The Court finds that the following material facts are undisputed:

1. Plaintiff Anoka Orthopaedic Associates (AOA) is engaged in the business of providing medical services in the field of orthopaedic medicine. Plaintiffs Anoka Orthopaedic Associates, P.A. Employees' Defined Benefit Pension Plan and Trust; Anoka Orthopaedic Associates, P.A. Employees' Profit Sharing Plan and Trust; and Anoka Orthopaedic Associates, P.A. Employees' Money Purchase Pension Plan and Trust (the Plans) are ERISA employee benefit plans of AOA. AOA is named in the plans as Plan Administrator. Plaintiffs Dr. Charles J. Cooley, Dr. John E. Wallestad, and Dr. Philip H. Haley (the Trustees) are shareholders and employees of AOA, beneficiaries of the Plans, and named in the Plans as Trustees. They are also third-party defendants in this action.

2. Defendant Edward J. Lechner (Lechner) is an attorney who provides legal services through his professional corporation, defendant E.J. Lechner, J.D. Ltd. (Lechner Ltd.). Lechner provided legal counsel to plaintiffs from 1975 to 1986. Defendant

---

1. Defendants also appear to base their motion for dismissal partly on a third ground: lack of a causal connection between the alleged breach of fiduciary duty and alleged damages resulting thereby. (Defendant Mutschler's Memorandum in Support of Motion for Summary Judgment at 14–19).

John G. Mutschler is the principal owner of defendant John G. Mutschler & Associates, Inc. (Mutschler & Associates). Mutschler & Associates worked with Lechner in providing various administrative and accounting services to plaintiffs.

3. Third–party defendant Ronald E. Flo served as AOA's part-time business manager and accountant from 1974 to 1986. (Wallestad depo. at 27; Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment at 3). Flo was the principal investment advisor to the Trustees. (Wallestad depo. at 33; Cooley depo. at 469).[2] Aside from the Trustees, he was the only individual actually handling Plan funds. (Cooley depo. at 469).[3]

4. From 1977 through 1985 Flo embezzled approximately $500,000 from plaintiffs. He embezzled the funds by persuading the Trustees to issue corporate and trust checks from time to time to his personal order under the guise that the funds would be converted in some fashion to jumbo certificates of deposit (CDs). (Cooley depo. at 438). These funds were converted by Flo. Flo has since pled guilty to criminal charges of embezzlement and is presently incarcerated.

5. The doctors hired Lechner to draft the Plans and Lechner did so. (Lechner depo. at 33, 41–42). He also prepared forms to be filed with the Internal Revenue Service (IRS) regarding the Plans' formation. (Lechner depo. at 44–48). Lechner was involved in preparing the Plans' annual reports to be filed with the Department of Labor (DOL) and IRS balance sheets and statements of participant equities, and drafted amendments to the Plans required by the IRS. (Lechner depo. at 52, 54).

6. Lechner informed employees about the various aspects of the Plans. (Lechner depo. at 53). On several occasions, Lechner met with Flo to discuss Plan matters. *Id.*

7. Lechner suggested to the Trustees that Mutschler & Associates be used to help him do work for the Plans. *Id.* Lechner decided which actuary to use in preparing the year end statements. *Id.* When Mutschler & Associates had an actuary working for them, that actuary performed the necessary work. (Lechner depo. at 57).

8. When employees left AOA, Lechner was advised and computed the participant's interest at termination. Ms. Katie Farnham, an employee from Mutschler & Associates, worked with him in performing administrative and accounting tasks for the Plans.

9. The Plans' tax returns were filed on a fiscal year-end basis on September 30. At each year end, Lechner and Farnham requested information pertaining to the Plans from Flo, AOA and the Trustees in order to complete the year end work.

10. Flo was persistently late in delivering year-end information to defendants. (Cooley depo. at 409). Procrastination was a consistent problem with Flo over a number of years in his dealings with defen-

---

2. Plaintiffs assert in their memorandum in opposition to defendants' motion for summary judgment that "[d]efendants erroneously assert that Flo was the principal investment advisor to the Trustees...." Plaintiffs cite Wallestad's deposition at pages 26–36 to support this assertion. Examination of the deposition testimony reveals that plaintiffs' assertion is wrong and defendants' is correct:

Q: Was any of the—were any of the persons upon whom you relied on investment advice a principal advisor?
A: By principal you mean—
Q: One you relied upon more than others?
A: In quantity or quality.
Q: Quantity.
A: Yes.
Q: Who?
A: Mr. Flo.

Q: Okay. Then it would be fair to say that Flo ... was a principal investment advisor to the Trustees?
A: Yes.

3. Plaintiffs again assert that this is a disputed fact. Plaintiff Cooley, however, specifically answered:

Q: ... was there anyone else beside Flo who was actually given custody of the funds of the plans?
* * * * * *
THE WITNESS: No.
(Cooley Depo at 469). Plaintiffs again cite Wallestad's deposition at 26–36 to support their assertion. That deposition, however, contains no statement which contradicts plaintiff Cooley's answer.

dants and with AOA in his role as business manager. (Cooley depo. 273–275, 562). The Trustees considered terminating Flo due to that problem. (Cooley depo. at 224). Lechner complained of Flo's failure to send required year-end information, and, as a result of a discussion with Cooley regarding difficulties with Flo in 1981, Lechner also sent a memorandum recommending four accountants to replace Flo. (Defendants' Ex. 1–8, filed with their motion).

11. Lechner and Farnham were not involved in the day-to-day, month-to-month bookkeeping of the Plans' transactions. The Trustees and Flo handled that. Lechner got involved with the Plans' work mostly at year-end. (Lechner depo. at 64). Lechner sent general letters requesting documentation from AOA regarding what occurred during the year. The following is an example of the letters' language:

As you are aware, the corporation's year end was September 30, 1981 and at this time we have not received a copy of the transactions in the corporation's retirement plans. We need the copies of all checking account statements, all investments, savings account statements and other documentation for our audit of the two plans.

Please call me if you have any questions. Otherwise, please direct that your employees gather this information and submit it to our office.

(Affidavit of James P. Mulvahill, Exh. A).

12. In response to those letters, and numerous follow-up letters, Flo eventually supplied certain year-end information. The information provided included a balance sheet and income summary which reflected the financial status of the Plans, account activity statements from various banks and a list referencing all assets, their value and corresponding income. (Flo depo. at 47–48; Def. Exhs. 10–18). Defendants relied on these documents in producing the year-end financial statements for each Plan. (Lechner depo. at 65).

13. Management of the Plans' funds and investments was handled by the Trustees in consultation with various investment advisors, primarily Flo. The defendants were not regularly consulted regarding Plan investments. The investments in "CDs" purportedly made by Flo were not made in consultation with defendants. Defendants did propose an investment in a movie production to the Trustees. Each Plan invested $34,000 in Bentley Productions. The Plans were in and out of the investment in approximately one year. (Lechner depo. at 92–93, 144–145).

14. Lechner met with the Trustees once a year, usually with Flo present, to go over the year-end statements.

## II. *Disputed Facts*

The following are facts that appear to be in dispute:

15. Plaintiffs assert in their memorandum in support of their motion for partial summary judgment that:

Lechner testified that when preparing Plan financial statements it was his ultimate responsibility to decide whether a transaction sheet was acceptable or whether transactional documents were necessary.

(Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment at 9). Plaintiffs cited to Lechner's deposition at page 55, which provides:

Q Now, who decided that either one of the two was acceptable? Was that a decision made by you or was that something that would have been made by someone in Mutschler & Associates?

MR. COLE: Are you talking about in this case?

MR. SOUCIE: Believe me, all these questions relate to this case. Do you understand that?

THE WITNESS: Yes.

BY MR. SOUCIE:

Q I thought you did. Who decided whether a transaction sheet was acceptable or whether the transactional documents were necessary in this case?

A I would have ultimate responsibility to decide that.

Plaintiffs also quoted the following from Lechners' deposition at page 62 in their memorandum as being a material, undisputed fact:

Q  Who decided how much documentation was needed to support these year end financial statement [sic]?

A  I guess it would be my ultimate responsibility to make that decision for the doctors as their lawyer.

Q  Who decided how much information would be contained in each year end financial statement?

A  The ultimate responsibility would be for me.

In their responsive memorandum defendants asserted that plaintiffs quotation was incomplete. On page 64 of his deposition, Lechner made the following clarification:

A  Well, okay. Before we get into that, something has been on my mind regarding the prior questioning.

Q  Okay.

A  And you had asked some questions regarding responsibility as far as the work performed for the clinic and I answered those questions in the framework of the responsibility of Katy Farnham and Mutschler's people, myself, and I don't know if that was clear in my answers.

Defendants assert that Lechner was making clear that it was his ultimate responsibility to decide how much documentation to use with Mutschler & Associates, not with the Trustees. Defendants contend that it was the Trustees who ultimately directed the decision as to whether they would have Flo produce to Lechner the underlying documentation for the "CDs". It is undisputed that Lechner never received from Flo copies of the CDs. It is also undisputed that Lechner did receive transactional summaries regarding the CDs prepared by Flo, and relied on those to draft the Plans' annual reports and file the necessary year-end Plan returns with the DOL and IRS. What appears to be disputed is whether it was the Trustees' administrative decision to trust Flo's preparation of the transaction summaries and not require Lechner to obtain the underlying documentation for the

CDs, or whether that administrative decision was made by Lechner. Lechner summarized his understanding in his deposition at pages 20–22:

The first discussion of the CDs came about after the 1979 year-end work was done because that's the first time two CDs appeared in the transaction log, and at that time I went out to the clinic and presented our book that showed the balance sheets on that were two CDs and when I sat down with the three doctors and I believe Ron Flo was at that meeting, I would go through on the balance sheet every asset on the balance sheet and make a comment or ask a question.

In the case of this client, I would ask questions because I had no idea what certain investments were such as the contract for deed, such as other things and such as the certificate of deposit.

At that meeting I asked what the certificate of deposit was at the first meeting and was told that it was an investment that Ron Flo had made and then Ron Flo went on to explain what was to be done or what had been done as far as the investment goes with taking the money and putting it with other clients of his monies and producing a CD.

At that meeting it also became apparent that in '77 they had stock in G.E.M. He had two debentures with G.E.M. They had stock at the Bank of Fairmont and at that meeting, Flo, at that meeting I believe the doctors said that they had some of the documentation. He didn't have all the documentation. At that meeting I brought up the fact that they should have in their possession documentation for the stock, for the CDs, for everything that was listed as an asset on the trust balance sheet.

I know sometime after that meeting, Cooley sent me a letter with a copy of the Fairmont stock certificate, the two G.E.M. debentures, the G.E.M. stock, and I think a contract for deed. The reason he sent that to me was I told them was that he had to have the documents in his possession and as a result of that, he sent me copies of those documents. *The*

*CDs did not appear on those documents and further conversation with Cooley, he said that "Ron is handling it. Don't worry about the CD." I had no more comments about the two $30,000 CDs on the '79 return, and then every year thereafter we went through with Flo at the meeting or without him at the meeting the balance sheet and the same response occurred at each meeting regarding the two CDs and the statement that I was not to worry about those, Ron Flo was handling that.* He was vesting the money and investing the money and they had no concerns regarding this investment. (emphasis added).

Flo's deposition appears to corroborate Lechner's:

Q During those meetings when the subject of certificates of deposit was come to, and I am talking about the ones that had been embezzled, how would they be handled or discussed?

A I don't recall they being discussed at length in any other manner except that they were certificates of deposits drawing whatever percentage that was reflected on the work sheet, *and that they were in my position [sic],* and we had X number of dollars to deal with in the following year, and what should we concern ourselves with.

\* \* \* \* \* \*

A They [the Trustees] had no reason to believe from my viewpoint that Lechner had possession because I always told them I did. I never shared that responsibility. I always assumed full responsibility for those C.D.'s because I personally treated them as loans to me and I was responsible for them.

(Flo depo. at 50–53) (emphasis added).

Plaintiffs assert in their memorandum that "[t]his factual allegation is contradicted by the depositions of all three doctors as well as Flo." (Plaintiffs' Memorandum in Opposition to Defendants' Motions for Partial Summary Judgment at 12). Plaintiffs, however, only cite Dr. Wallestad's deposition at 95 and Flo's deposition at 145. An examination of the deposition testimony reveals that Lechner's statement was not contradicted, as Flo stated, "I don't know. It could have been said, but I don't recall it specifically." And the portion of Dr. Wallestad's deposition cited as showing a contradiction contains no discussion at all of whether Lechner asked about the CDs missing at the year-end meetings. (Wallestad depo. at 95). Dr. Cooley, however, did state in his deposition that he did not recall Lechner saying anything about CDs at the year end meetings. (Cooley depo. at 574).

16. There also appears to be a dispute over the question of whether Lechner gave investment advice to the Plans regarding an investment in a Perkins Restaurant.

### III. *Defendants' Admissions of Fact*

For purposes of this motion, defendants are willing to admit that they performed the following services: (1) designed the Plans; (2) formulated the specifications of the Plans; (3) performed Plan administration services, including presentation of accounting statements, preparation of financial reports, internal audits, investment review and one occasion of investment advice.

### DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered "if the pleadings, deposition, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". At the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.*

### I. *Fiduciary Status Under ERISA*

ERISA provides that:

The term "named fiduciary" means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly.

29 U.S.C. § 1102(a)(2) (1982). Every employee benefit plan must provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administer the plan. 29 U.S.C. § 1102(a)(1) (1982).

In the instant case, none of the defendants were named in the Plans as fiduciaries, nor were defendants identified as fiduciaries pursuant to a procedure specified in the Plans. AOA is named as Plan Administrator and Drs. Cooley, Wallestad and Haley are all named as Trustees.

ERISA provides for another method by which a person, even without his knowledge, may become a fiduciary:

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (1982). The following legislative history sheds light on the meaning of this provision:

Under this definition, fiduciaries include officers and directors of a plan, members of a plan's investment committee and persons who select these individuals. Consequently, the definition includes persons who have authority and responsibility with respect to the matter in question, regardless of their formal title. The term "fiduciary" also includes any person who renders investment advice for a fee and includes persons to whom "discretionary" duties have been delegated by named fiduciaries.

While the ordinary functions of consultants and advisers to employee benefit plans (other than investment advisers) may not be considered as fiduciary functions, it must be recognized that there will be situations where such consultants and advisers may because of their special expertise, in effect, be exercising discretionary authority or control with respect to the management or administration of such plan or some authority or control regarding its assets. In such cases, they are to be regarded as having assumed fiduciary obligations within the meaning of the applicable definition.

H.R.Conf.Rep. No. 1280, 93d Cong., 2nd Sess. 323, *reprinted in* 1974 U.S.Code Cong. & Admin. News 4639, 5038, 5103. The congressional policy underlying enactment of ERISA was "to protect ... the interests of participants in employee benefit plans and their beneficiaries ... by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans". 29 U.S.C. § 1001(b) (1982).

II. *Analysis*

A. Preparing Year–End Financial Statements, Conducting Audits, and Making Decisions In the Course of Performing These Services

■ Defendants admit for purposes of this motion that they undertook the tasks of preparing year-end financial reports for the Plans and, in the process of preparing those reports, that they performed audits of the Plans. Whether performance of services such as these would subject a person performing them to potential fiduciary liability under ERISA is a question which has only recently been addressed by courts. *See Yeseta v. Baima,* 837 F.2d 380, 385 (9th Cir.1988) (accountant that reviewed books and prepared financial statements and tax returns for a plan is not a fiduciary of the plan); *Painters of Philadelphia District Counsel No. 21 v. Price Waterhouse,* 699 F.Supp. 1100 (E.D.Pa.1988) (Price Wa-

terhouse is not a fiduciary as a result of performing audits for plaintiffs).

In *Painters of Philadelphia*, the plaintiff alleged that Price–Waterhouse had failed to "acknowledge, investigate, itemize, evaluate or notify" in conducting an audit of the plan, unreasonable fees charged by the administrator of the plan and had thereby breached its fiduciary duties under ERISA. 699 F.Supp. at 1101 (quoting the Complaint, paragraph 24). As one of its reasons for holding that auditing is a ministerial, not a discretionary function, and therefore not an ERISA fiduciary function, the district court relied on language in the Ninth Circuit decision in *Yeseta* which said:

> [The accountant] was not a fiduciary. His control over the plan was purely ministerial.
>
> .    .    .    .    .
>
> [The accountant] reviewed the books and prepared financial statements and tax returns for ... the [p]lan. This limited authority does not confer, nor did [the accountant] actually exercise, "control respecting management of the [p]lan." 29 U.S.C. § 1002(21). (citation omitted). As a result, [the accountant] was not a fiduciary of the [p]lan.

*Id.* at 1102 (quoting *Yeseta v. Baima*, 837 F.2d 380, 385 (9th Cir.1988)). After quoting this passage, the district court then stated that "[a]uditing is no less ministerial here than were the other accounting services in *Yeseta*. Furthermore, the plain language of 29 U.S.C. § 1002(21) does not include auditing functions within the ERISA definition of 'fiduciary'." *Id.*

This Court finds the reasoning in *Painters of Philadelphia* and *Yeseta* persuasive, and holds that the financial reporting and auditing services which defendants performed in this case were ministerial not discretionary functions as envisioned by Congress in 29 U.S.C. § 1002(21)(A), therefore defendants do not become fiduciaries subject to liability under ERISA for their performance of those services.

Implicit in this holding is the conclusion that decisions necessarily made in carrying out those services do not cause a person to be considered a fiduciary under ERISA. While neither *Painters of Philadelphia* nor *Yeseta* directly addressed this issue, it would make no sense to hold that preparing year-end financial statements and conducting audits would not make a person a fiduciary, while the decisions made in carrying out these services would. Even if plaintiffs' contentions are assumed true—that in the process of preparing year-end statements defendants made the decision to perform internal audits not technically required by ERISA, and, in the process of performing the audits, they made the decision not to require Flo to produce copies of the CDs—this Court holds that such limited authority over administration of the Plans was not significant enough to make defendants fiduciaries under ERISA. Since the Court assumes, for purposes of resolution of defendants' motion, that defendants made the decisions alleged, the issues of fact concerning who made those decisions [4] are not material to the Court's resolution of defendants' motion.

Plaintiffs seek to distinguish *Yeseta* but fail to mention *Yeseta's* holding that an accountant who "reviewed the books and prepared financial statements and tax returns" for a plan is "not a fiduciary of the plan." 837 F.2d at 385. The Ninth Circuit stated that the "limited authority" the accountant exercised in performing these services could not make her a fiduciary under ERISA. *Id.*

Similarly, in the instant case the "limited authority" defendants exercised in preparing year-end financial statements for the Plans, conducting audits of the Plans and making decisions in carrying out those tasks, do not make them ERISA fiduciaries. *Yeseta*, therefore, is indistinguishable from this case.

This conclusion is supported by a Ninth Circuit case which followed *Yeseta*. *See Nieto v. Ecker*, 845 F.2d 868 (9th Cir.1988). In *Nieto*, the Court of Appeals stated that *Yeseta* established the standard that "an

---

**4.** *See* paragraph 15 in the fact section above.

attorney rendering professional services to a plan is not a fiduciary so long as he does not exercise any authority over the plan 'in a manner other than by usual professional functions' ". *Id.* at 870 (quoting *Yeseta,* 837 F.2d at 385). The court then applied that standard to hold that an attorney who failed to collect plan assets under his discretionary control was not a fiduciary. The court reasoned that if a contrary conclusion were adopted "anyone performing services for an ERISA plan—be it an attorney, an accountant, a security guard or a janitor—would be rendered a fiduciary insofar as he exercised some control over trust assets and through negligence or dishonesty jeopardized those assets." *Id.* at 870–871. That reasoning applies in the instant case.

### B. Other Services Performed By Defendants

Plaintiffs further contend that other services defendants performed[5] made them fiduciaries to the Plans under ERISA. The Court holds that those services do not make defendants fiduciaries for two reasons. First, under regulations and interpretive bulletins issued by the Department of Labor (DOL) discussed below, and under *Nieto, Yeseta* and *Painters of Philadelphia,* the limited authority exercised by defendants over plan assets and plan administration did not make them fiduciaries. Second, even if the Court were to assume that those activities did make defendants fiduciaries, the injuries plaintiffs allege they suffered were not caused by defendants' performance of those services.

■ Analysis of the investment advice purportedly given by defendants (*see* factual allegations at paragraphs 13 and 16) illustrates this holding. Department Of Labor regulations provide:

A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within the meaning of section 3(21)(A)(ii) of the Employee Retirement Income Security Act of 1974 (the Act) and this paragraph, only if:

(i) Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; and

(ii) Such person either directly or indirectly (e.g., through or together with any affiliate)—

(A) Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or

(B) Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement, or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3–21(c)(1) (1987). Applying this regulation to Lechner's activities, even if the Court assumes that he gave the investment advice as to the Bentley Productions and Perkins Restaurant investments, such rendering of advice would not cause him to become a fiduciary. Lechner neither had "discretionary authority or control with respect to purchasing or selling securities" for the Plans, 29 C.F.R. § 2510.3–21(c)(1)(ii)(A) (1987), nor did he render advice "on a regular basis", 29 C.F.R. § 2510.3–21(c)(1)(ii)(B) (1987).

---

**5.** Specifically, with respect to defendant Lechner, plaintiffs point to the services identified above in the factual section in paragraphs 5, 6, 7, 8, 9, 11, 13, 14 and 16 (part of paragraphs 9, 11 and all of paragraph 15 relate to services already considered above). With respect to the other defendants, paragraphs 8 and 9 state the services that they provided.

■ Even if the Court were to assume Lechner was a fiduciary for rendering this investment advice, the damages plaintiffs alleged they incurred did not result from this advice. Instead, the alleged damages resulted from the investment advice Flo gave the Trustees regarding the CDs. In interpreting 29 U.S.C. § 1002(21)(A) (1982), the DOL issued the following question and answer:

> FR–16 Q: Is a fiduciary who is not a named fiduciary with respect to an employee benefit plan personally liable on all phases of the management and administration of the plan?
>
> A: A fiduciary with respect to the plan who is not a named fiduciary is a fiduciary *only to the extent* that he or she performs one or more of the functions described in section 3(21)(A) of the Act. *The personal liability of a fiduciary who is not a named fiduciary is generally limited to the fiduciary functions, which he or she performs with respect to the plan.*

29 C.F.R. § 2509.75–8 (FR–16) (1987) (emphasis added). In *Brandt v. Grounds,* 687 F.2d 895 (7th Cir.1982), the court relying in part on this interpretation held that, even assuming the defendant Bank rendered investment advice to a plan, damages must be alleged that were caused by the rendering of the advice to prevent the ERISA allegations of the complaint from being dismissed. *Id.* at 898. The Court reasoned that pursuant to 29 U.S.C. § 1109(a) (1982) (person is liable for damages "resulting from each ... breach" of fiduciary duty) damages awarded under ERISA must result from a breach of a fiduciary activity, and since the plaintiffs had failed to allege that the investment advice caused the injury, the ERISA claims had to be dismissed. *Id.* at 898–899.

In the instant case, plaintiffs' Amended Complaint does allege that all of the listed activities of defendants, including the providing of investment advice, caused its injuries. (Amended Complaint, paragraph 23). Defendants argue, however, that this Court should apply *Brandt* and 29 C.F.R. § 2509.75–8 (FR–16) (1987) to hold that, since the conducting of the audit is the only activity which arguably bears a causal connection to the injuries alleged in this case, the Court need not consider whether any of the other services defendants performed for plaintiffs, including the rendering of investment advice, made them fiduciaries. (Defendant Mutschler's Memorandum in Support of Defendants' Motion for Partial Summary Judgment at 14–15). Essentially, defendants are arguing that since 29 U.S.C. § 1002(21)(A) (1982) limits fiduciary status "to the extent" of the activities performed in accordance with that section, and since the facts show that, except for the auditing service, none of the services performed by defendants bore any causal connection to the injuries alleged, the Court should find that, regardless of whether those services made defendants fiduciaries, the essential element of causation is missing and therefore summary judgment is appropriate. The Court agrees and so holds.

The causal link between defendants' rendering of investment advice and the damages to plaintiffs which resulted from Flo's embezzlements is nonexistent. The necessary causal connection is also nonexistent with respect to services, other than auditing, which defendants performed. The drafting and amending of the Plans, informing employees of the aspects of the Plans, deciding on actuaries, computing the participants' interests at termination, filing tax returns and other annual reports with the IRS and DOL, meeting with Flo to discuss Plan matters or meeting with the Trustees to go over year-end statements did not cause the damages to plaintiffs. No reasonable juror could find otherwise, therefore, summary judgment dismissing plaintiffs' claims that those services caused their injury is granted.

Summary judgment dismissing plaintiffs' claims based upon those services is also appropriate because the limited authority over Plan assets or administration that defendants exercised in performing those services did not make them fiduciaries under 29 U.S.C. § 1002(21)(A) (1982). The DOL issued the following question and answers interpreting § 1002(21)(A):

D–1 Q: Is an attorney, accountant, actuary or consultant who renders legal accounting, actuarial or consulting services to an employee benefit plan (other than an investment adviser to the plan) a fiduciary to the plan solely by virtue of the rendering of such services, absent a showing that such consultant (a) exercises discretionary authority or discretionary control respecting the management of the plan, (b) exercises authority or control respecting management or disposition of the plan's assets, (c) renders investment advice for a fee, direct or indirect, with respect to the assets of the plan, or has any authority or responsibility to do so, or (d) has any discretionary authority or discretionary responsibility in the administration of the plan?

A: No. However, while attorneys, accountants, actuaries and consultants performing their *usual professional functions* will ordinarily not be considered fiduciaries, if the factual situation in a particular case falls within one of the categories described in clauses (a) through (d) of this question, such persons would be considered to be fiduciaries within the meaning of section 3(21) of the Act.

D–2 Q: Are persons who have no power to make any decisions as to plan policy, interpretations, practices or procedures, but who perform the following administrative functions for an employee benefit plan, within a framework of policies, interpretations, rules, practices and procedures made by other persons, fiduciaries with respect to the plan:

(1) Application of rules determining eligibility for participation or benefits;

(2) Calculation of services and compensation credits for benefits;

(3) Preparation of employee communications material;

(4) Maintenance of participants' service and employment records;

(5) Preparation of reports required by government agencies;

(6) Calculation of benefits;

(7) Orientation of new participants and advising participants of their rights and options under the plan;

(8) Collection of contributions an application of contributions as provided in the plan; .

(9) Preparation of reports concerning participants' benefits;

(10) Processing of claims; and

(11) Making recommendations to others for decisions with respect to plan administration?

A: No. Only persons who perform one or more of the functions described in section 3(21)(A) of the Act with respect to an employee benefit plan are fiduciaries. Therefore, *a person who performs purely ministerial functions* such as the types described above for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons *is not a fiduciary* because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.

29 C.F.R. § 2509.75–5 and § 2509.75–8, respectively (1987) (emphasis added).

Many of the services defendants performed which plaintiffs argue make them fiduciaries are specifically identified as "purely ministerial" administrative services in interpretive bulletin 29 C.F.R. § 2509.75–8(D–2) (1987) quoted above. For example, preparation of reports required by the IRS and DOL, 29 C.F.R. § 2509.75–8(D–2)(5) (1987), calculation of benefits for participants at year end, 29 C.F.R. § 2509.75–8(D–2)(6) (1987), and meeting with employees, 29 C.F.R. § 2509.75–8(D–2)(7) (1987), are all identified as ministerial. Furthermore, by analogy, and based upon restrictive applications of these bulletins in *Nieto, Yeseta* and *Painters of Philadelphia,* the rest of the services defendants performed were also "minis-

terial", 29 C.F.R. § 2509.75–8(D–2)(A) (1987). The limited authority defendants exercised over the Plans did not go beyond the purview of "usual professional functions". 29 C.F.R. § 2509.75–5(D–1) (1987); *Yeseta,* 837 F.2d 380, 385 (9th Cir.1988); *Nieto,* 845 F.2d 868, 870 (9th Cir.1988).

Plaintiffs argue that the Eighth Circuit Court of Appeals' decision in *Monson v. Century Mfg. Co.,* 739 F.2d 1293 (8th Cir. 1984) is controlling and requires this Court to find, as a matter of law, that defendants are fiduciaries under ERISA. In *Monson,* the Eighth Circuit affirmed the district court's[6] decision that defendant Weber, who was a general manager of a corporation, but not a named fiduciary of a profit sharing plan of that corporation, was a fiduciary to the plan under ERISA. The district court's order cited 29 U.S.C. § 1002(21)(A) (1982) as authority for its holding but contained no further discussion interpreting the statute. *See Monson v. Century Mfg. Co.,* No. 4–80–614, slip op. at 28 (D.Minn. May 19, 1983). Weber argued on appeal that the district court had improperly concluded that he was a fiduciary. The Eighth Circuit provided the following response:

> Defendant Weber argues that he was not a fiduciary with respect to the retirement plan. Under 29 U.S.C. § 1002(21)(A), subject to exceptions that do not apply here,
>> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
> The District Court's finding that Weber exercised discretionary authority with respect to the administration or management of the retirement plan is supported by the record. Weber helped work on the amendments made to the plan in 1976. He was largely responsible for informing employees about both plans.

He met with the company's independent accountant to discuss the issue of officially recognizing the one-third bonus. He consulted on plan investments and had the authority to make some press releases without Sundet's prior approval. *See Eaves v. Penn,* 587 F.2d 453, 457–59 (10th Cir.1978) (officer and director who gave investment advice held to be fiduciary).

739 F.2d at 1303.

In *Monson,* the fiduciaries of a profit-sharing plan misrepresented to the employee/beneficiaries that the percentage of profit going into the plan was 50 percent when in fact it was 33 percent. The company was large enough that over a period of years the misrepresentation caused millions of dollars of damages to the plaintiff employees. Weber was one of four individuals directly held to be involved in the misrepresentations. He was also the only one not named as a fiduciary in the plans. The factors listed by the Eighth Circuit as activities evidencing Weber's fiduciary status relate almost exclusively to his participation in the misrepresentations. Weber's "work on amendments to the plan in 1976" involved an amendment which made explicit the 33 percent split using what was referred to as a "historical formula." *See* 739 F.2d at 1299. The employees were not informed about this "historical formula" until late 1980. *Id.* The failure to properly inform the employees was the basis for the Court's finding of breach of fiduciary duty.

The fact that "Weber was largely responsible for informing the employees about the plans," *id.* at 1303, was also considered as an exercise of a fiduciary function. Weber's failure to honestly perform this function caused the injury the employees incurred. The same was true with respect to Weber's failure to truthfully exercise his "authority to make some press releases without Sundet's prior approval." *Id.*

In its opinion, the Eighth Circuit also noted that Weber was a fiduciary because "he met with the company's independent

---

6. The Hon. Earl R. Larson, Senior United States District Judge for the District of Minnesota.

accountant to discuss the issue of officially recognizing the one-third bonus." *Id.* This fact was important because it showed that Weber exercised fiduciary control over plan assets by participating in the decision to disclose the truth about the plans. The failure to disclose the truth caused the injury in the case.

In the instant case it is undisputed that the defendants did not know of or partake in Flo's misrepresentations. While Weber's work on amendments to the plan involved his knowing participation in fraud that caused the plaintiffs' injury in *Monson,* here the defendants work on amendments were required by statute and were in no way related to plaintiffs' injury. The same is true of all of defendants' activities which plaintiffs have analogized to those identified in Weber. The extent of most of Weber's activities which the Eighth Circuit listed as giving him fiduciary status directly involved the misrepresentations which caused the plaintiffs' injury. The same cannot be said of the present defendants' activities analogized to those of Weber.

*Monson* did not address one of the key questions at issue here: whether an outside lawyer and accountant preparing year-end financial reports, conducting audits of Plan assets, and making limited decisions in the process of performing these services is a fiduciary under ERISA. Weber was an inside senior manager of the corporation carrying the plan and directly participated in the fraud found in that case. Defendants provided outside services to AOA and had no knowledge of Flo's fraud. *Monson* is not controlling in this case.

### CONCLUSION

Based upon the foregoing, IT IS HEREBY ORDERED that:

1. Plaintiffs' motion for summary judgment is denied.

2. Defendants' motion for summary judgment is granted on the grounds that defendants are not fiduciaries under ERISA, and that most of the services that plaintiffs assert made defendants' fiduciaries fail to bear the requisite causal relationship with the damages alleged in this case.

3. All of plaintiffs' ERISA claims are dismissed.

THERE BEING NO JUST REASON FOR DELAY, LET JUDGMENT BE ENTERED ACCORDINGLY.